# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

DENNIS MALIPURATHU,                )
                                   )
            Plaintiff,             )
                                   )
vs.                                )        Case No. 13-CV-396-JHP-PJC
                                   )
BRAD JOHNSON, CARL BEAR,           )
TERRY MARTIN, ROBERT PATTON,       )
ADEBAYO OJEKALE                    )
                                   )
            Defendants.            )

## OPINION AND ORDER

This is a 42 U.S.C. § 1983 civil rights action commenced by Plaintiff, a pro se prisoner currently in custody of the Oklahoma Department of Corrections (DOC) at the Jess Dunn Correctional Center (JDCC), in Taft, Oklahoma. On June 25, 2014, Defendants filed a Motion for Summary Judgment (Dkt. # 55). On July 14, 2014, Plaintiff filed a response to the motion (Dkt. # 57). Also before the Court are Plaintiff's "motion seeking leave to amend plaintiff complaint" (Dkt. # 54), "motion seeking leave to permit reply" (Dkt. # 58), "motion to compel defendant's counsel to comply with change of address/service" (Dkt. # 59), "motion to supplement evidence bolstering plaintiff's exhaustion claim at JCCC" (Dkt. # 61), "motion for contempt order against defendant Patton" (Dkt. # 62), "motion to admit tangible evidence" (Dkt. # 73), and "motion to exhibit newly discovered evidence into the court record" (Dkt. # 75). In response to Plaintiff's motion to supplement evidence, Defendants filed a motion to strike (Dkt. # 65). Defendants also filed a response to Plaintiff's motion for contempt. (Dkt. # 67).

For the reasons discussed below, the Court finds that the Defendants are entitled to summary judgment in their favor and their motion is granted as no genuine dispute of material fact exists. Additionally, the Court grants Plaintiff's motions to supplement evidence (Dkt. ## 61, 73, 75) and

motion seeking leave to reply (Dkt. # 58), finds Plaintiff's motion to compel (Dkt. # 59) moot, finds

Defendants' motion to strike (Dkt. # 65) moot, and denies Plaintiff's motion to amend (Dkt. # 54)

and motion for contempt (Dkt. # 62).

## *BACKGROUND*

When he filed his complaint, Plaintiff resided at the Dick Conner Correctional Center

(DCCC). (Dkt. # 1 at 6). Plaintiff raises a single count in his § 1983 complaint, alleging Defendants

violated his constitutional rights, namely those protected by the Free Exercise and Establishment

Clause of the First Amendment. Id. at 5-6. Since filing this civil rights action, Plaintiff has been

transferred several times to other DOC facilities, and currently resides at the Jess Dunn Correctional

Center (JDCC).

Plaintiff is a practitioner of the Sikh religion. Id. at 6. Prior to his transfer to DCCC,

Plaintiff was approved for a halal diet at William S. Key Correctional Center (WKCC). (Dkt. # 22-

5). When Plaintiff arrived at DCCC, he requested a halal religious diet by completing the necessary

form and listed his religion as Sikh. (Dkt. # 22-3 at 2). DCCC Chaplain, Defendant Brad Johnson,

denied the request, and responded to Plaintiff in writing, as follows:

> I have received your request for a Halal Diet. You have listed your religion as Sikh.
> According to policy Sikh is not eligible to receive a Halal Diet. This is only for
> those who are Muslim or Nation of Islam. I have attached that part of the policy OP-
> 030112. By policy your request must be denied.
> I have spoken with the Agency Chaplain Leo Brown regarding this. He has told me
> that if you wish to have Sikh added to the list of religions eligible for the Halal Diet
> you may submit that request to him through my office. Be advised you will need to
> provide documentation that the Sikh religion requires a Halal Diet through sacred
> texts or outside religious sources.

Id. at 4. Chaplain Johnson also told Plaintiff that "he would need to enter 'Sikh/Islam' as his
religion

in order to qualify for the Halal diet." (Dkt. # 22 at 32). Plaintiff submitted a second religious diet request listing "Sikh (Islam/Hindu)" as his religion and the halal diet was approved. (Dkt. # 22-4). To date, Plaintiff has failed to submit any evidence that he followed the process outlined by Chaplain Johnson to add the Sikh religion to the list of approved religions eligible to receive a halal diet. In fact, in Plaintiff's response to Defendant's motion for summary judgment he explains,

> Plaintiff need not submit 'A Request to Staff'. Plaintiff is not required to have his religion added to 030112E, though Chaplains can verify previous authorizations by communicating with other facility Chaplains . . . Mr. Brown cannot coerce Plaintiff to have his religion added to DOC policy. Plaintiff abstains from doing so where DOC is claiming Kosher-certified vegetarian meals, food blessed in the name of any other deity besides Allah is 'constitutionally sufficient' for halal diet.

(Dkt. # 57 at 29).

Once Plaintiff began receiving the halal diet, he filed "Requests to Staff" complaining that the halal diet improperly contained kosher foods. (Dkt. # 1 at 8). In response to Plaintiff's complaints regarding the halal diet, Defendants stated they were required to follow DOC policy and meals were served in compliance with that policy. Id. at 9, Ex. H. Both Plaintiff and Defendants have presented copies of the master halal diet menu served at DCCC. See id., Ex. E; Dkt. # 55-5. Additionally, Plaintiff recently submitted to the Court an updated halal diet menu.[1]

On July 2, 2013, Plaintiff filed this 42 U.S.C. § 1983 civil rights action. Plaintiff raises a single count in his complaint: that Defendants violated his constitutional rights, namely those rights protected by the Free Exercise and Establishment Clauses of the First Amendment. See Dkt. # 1 at 5-6. Plaintiff claims the Free Exercise Clause "guarantees DOC will not prevent Plaintiff from

---

[1]Originally, Plaintiff alleged he received only three to four halal certified meals per week. This new halal diet menu submitted by Plaintiff reflects that, of the fourteen pre-packaged meals served each week, nine are now halal certified meals. See Dkt. # 73, Attachment 1. The remaining five pre-packaged meals per week are vegetarian kosher meals. See id.

pursuing any religion." Id. at 5. Plaintiff also contends that the Establishment Clause "prevents DOC from[] forcing plaintiff to choose between violating a tenet of his faith and eating[,] coercing Plaintiff to pick a different religion so that Plaintiff can properly practise [sic] his religion . . . and establishing a rule/policy that intentionally violates the religious diet requested." Id. at 6. In the "Nature of the Case" section of the complaint, Plaintiff describes his case as follows:

> This action is to seek a permanent injunction against DOC to serve Plaintiff with foods that are consistent with the religious diet Plaintiff has requested, and ensure that DOC does not intentionally violate Plaintiff's 1st Amendment rights through enforcement of prison rules (DOC OP#). DOC is an instrumentality of the state. Named Defendants have been given notice by Plaintiff that his religious diet has been intentionally violated by a prison rule and is due protection during Plaintiff's custody. DOC policy increases Plaintiff's vulnerability to violate a tenet of his faith and eat non-halal foods (meat) or follow his faith and starve by not eating foods that are inconsistent with the diet requested. Plaintiff claims DOC policy illegally and intentionally violates the establishment clause; the DOC master menu for halal diet intentionally feeds (18)-meals per week that is inconsistent with the diet requested, feeding Plaintiff with Kosher foods; and Plaintiff was coerced to alter his choice of religion to participate in his requested diet at DCCC.

Id. at 4-5. In his request for relief, Plaintiff seeks four specific remedies:

> 1. Permanent injunction preventing DOC from placing Plaintiff into solitary confinement or transferring plaintiff to private prisons . . . as a means of retaliation and shirking its (DOC's) responsibility to provide "halal" diet at no cost to Plaintiff; as previously ruled in Harmon v. Jones, 2012 WL 6765597;

> 2. Permanent injunction to change DOC policy to "serve only foods that are consistent with religious diet requested, where the institution is the source of the food" ensuring protection of Plaintiff's 1st amendment rights;

> 3. Grant the cost of this action upon Defendants and reimburse Plaintiff for incurred expenses;

> 4. Grant any amount of equitable, element of damage the court may deem fit; for instance, Circuit Courts have awarded from $300 per day to $200,000 for acts constituting deprivation of liberty to denying religious practice.

Id. at 11-12.

### PRELIMINARY CONSIDERATIONS

### 1. Plaintiff's Motion to Amend is Denied

Before Defendants filed their Motion for Summary Judgment, Plaintiff filed his "motion seeking leave to amend plaintiff complaint to add claims of 8th amendment and retaliation pursuant to Fed. R. Civ. P. Rule 15(a)(2)." (Dkt. # 54). The motion to amend was filed the same day the Court filed its Order denying Plaintiff's previous motion to supplement. (Dkt. # 52). In his new motion, Plaintiff seeks to add claims similar to those raised in his previous motion to supplement. Defendants filed a response (Dkt. # 56) to Plaintiff's most recent motion to amend.

After Defendants filed their response to Plaintiff's motion to amend, Plaintiff filed a "motion seeking leave to permit reply." (Dkt. # 58). In his motion, Plaintiff cites several Federal Rules of Civil Procedure "seeking supplemental jurisdiction." Id. at 1. However, Plaintiff's motion itself appears to be a general reply to the arguments posed by Defendants in opposition of Plaintiff's motion to amend. Therefore, the Court construes Plaintiff's motion as a reply to Defendants' response motion, and Plaintiff's motion seeking leave to reply (Dkt. # 58) is granted. The Court has considered the arguments presented in the motion in resolving the issues raised in the motion to amend.

In his most recent motion to amend, Plaintiff claims new defendants at different prison facilities have violated his constitutional rights. Several of these new defendants were also proposed parties in Plaintiff's previous motion to supplement. These new claims occurred after Plaintiff filed his original complaint. The Court categorizes the claims as follows: claims of retaliation against defendants not named in the original complaint, claims that the new defendants are violating Plaintiff's religious rights relating to his halal diet, claims that law library staff are violating

Plaintiff's "legal confidence," claims against DOC Agency Chaplain Leo Brown, and claims alleging Eighth Amendment violations. Defendants filed a response in opposition to Plaintiff's motion to amend, arguing that permitting Plaintiff to add the new claims would cause undue delay and prejudice to the original Defendants. (Dkt. # 56 at 1-2). As stated above, Plaintiff replied to Defendants' response. (Dkt. # 58). After careful review, the Court denies Plaintiff's motion on the grounds of futility, undue delay, and prejudice to the original defendants.

Under Federal Rule of Civil Procedure 15(a)(2) "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." The Tenth Circuit has explained, "[a]lthough leave to amend 'shall be freely given when justice so requires,' whether leave should be granted is within the trial court's discretion." Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990) (quoting FED. R. CIV. P. 15(a)). Courts may deny a request for leave to amend on "a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005). While delay alone is an insufficient ground to deny leave to amend, "[a]t some point, however, delay will become undue, placing an unwarranted burden on the court, or will become prejudicial, placing an unfair burden on the opposing party." Minter v. Prime Equip. Co., 451 F.3d 1196, 1205 (10th Cir. 2006) (quoting USX Corp. V. Barnhart, 395 F.3d 161, 167 (3d Cir. 2004)). The Tenth Circuit has stated that the most important factor in deciding a motion to amend the pleadings "is whether the amendment would prejudice the nonmoving party." Minter, 451 F.3d at 1207. "Most often, this occurs when the amended claims arise out of a subject matter different from what was set forth in

the complaint and raise significantly new factual issues." Id. at 1208. Finally, while Plaintiff's previous motion to supplement, alleging many of the same facts, was an attempt to supplement and/or amend his complaint under Federal Rule of Civil Procedure 15(d), the "standard used by courts in deciding to grant or deny leave to supplement is the same standard used in deciding whether to grant or deny leave to amend." Fowler v. Hodge, 94 F. App'x 710, 714 (10th Cir. 2004) (unpublished)[2] (quoting 3 James Wm. Moore et al., Moore's Federal Practice § 15.30 at 15-109).

### a. Claims of Retaliation

In his motion seeking leave to amend, Plaintiff raises several allegations of retaliation against new defendants at different prison facilities. Plaintiff alleges that, since he filed this lawsuit, DOC has transferred him to several different prison facilities in retaliation.[3] See Dkt. # 54 at 12. Plaintiff also alleges he was placed in a segregated housing unit and issued disciplinary charges for "poking" holes in his food, throwing his food away, and returning non-Halal food items to food services, in retaliation for his pending lawsuit. Id. at 9-16. Plaintiff asserts these disciplinary charges have resulted in his temporary removal from the halal diet "without a due process hearing." Id. at 16-17. Additionally, Plaintiff alleges retaliatory action where DOC personnel respond to his requests to staff regarding his religious diet by stating they may not address "pending litigation." Id. at 7, 14.

_____

[2]This unpublished opinion is not precedential but is cited for its persuasive value. See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

[3]Plaintiff also alleges "further retaliation claims as Plaintiff is now minimum-security eligible and Defendant Patton's employees refuse to prepare documentation to allow transfer to lower-security." (Dkt. # 54 at 8). However, as Plaintiff informed the Court in his Notice of "Change of Address" filed after the motion to amend, Plaintiff was subsequently transferred to Jess Dunn Correctional Center (JDCC), which Plaintiff describes as a "minimum-security prison." (Dkt. # 66 at 1). Therefore, Plaintiff's retaliation claim based DOC's alleged refusal to transfer him to a lower security prison is now moot.

These new allegations are substantially the same as the claims Plaintiff raised in his previously denied motion to supplement. None of these new claims relate to the original defendants or DCCC. Allowing Plaintiff to amend his complaint to add claims of retaliation at this stage would cause undue delay and prejudice to the original defendants. Therefore, for the same reasons stated by the Court in its previous Order denying Plaintiff's motion to supplement (Dkt. # 52), Plaintiff's motion to amend to include claims of retaliation is denied without prejudice.

**b.     First Amendment Claims**

Throughout his motion to amend, Plaintiff claims the new defendants served or are serving him non-halal meals. These claims are substantially the same claims raised by Plaintiff against Defendants in the original complaint. Plaintiff also raised these First Amendment claims relating to new defendants and new prison facilities in his motion to supplement. For the same reasons stated by the Court in its previous Order denying Plaintiff's motion to supplement (Dkt. # 52), the Court finds allowing Plaintiff to amend his complaint to add First Amendment claims against new defendants from different DOC facilities is futile, and will cause undue delay and prejudice to the original defendants. As this Court has stated previously, the resolution of the claims raised in the original complaint will resolve Plaintiff's claims against the proposed new defendants regarding the challenged DOC religious meal policy. Therefore, Plaintiff's motion to amend to include additional claims of First Amendment violations against new defendants is denied without prejudice.

**c.     "Legal Confidence" Claim**

In his motion to amend, Plaintiff raises a claim against Felicia Harris, who is a law library attendant at JCCC. Plaintiff alleges that "Mrs. Harris confiscates offender's filings and e-mails them to unknown individuals, violating legal confidence to seek redress in Courts," and that "[i]t is

plausible that Mrs. Harris is notifying Defendants, or their counsel of Plaintiff's filings, violating 1st Amendment." (Dkt. # 54 at 7). Plaintiff asserts he has "witnessed Mrs. Harris attach his federal document to an e-mail and transfer it to a non-court location, violating legal confidence." Id. at 15. Additionally, Plaintiff claims "Mrs. Harris attempts to secretly code Plaintiff's documents; however, on 5/29/14, Plaintiff viewed a filing encoded by Mrs. Harris as 'warden mali 261346 5-29-14x1 (and) x2.'" Id. at 7. Finally, Plaintiff alleges Harris told Plaintiff he "could not draw these documents, nor send them to the Court!" Id. at 15. However, Plaintiff does not explain this alleged statement.

These allegations against Harris relate to a new defendant at a different prison facility, and "arise out of a subject matter different from what was set forth in the complaint and raise significantly new factual issues." See Minter, 451 F.3d at 1208. Evaluation of this new claim would require a Special Report from the new prison facility and time for Harris to answer or respond to Plaintiff's claim. Therefore, allowing Plaintiff to amend would cause undue delay and prejudice to the original defendants. Plaintiff's motion to amend to include a claim against Harris is denied without prejudice.

### d.     Claims Against DOC Agency Chaplain Leo Brown

Plaintiff also appears to raise a claim against Leo Brown, DOC Agency Chaplain. See Dkt. # 54 at 3. Plaintiff alleges Brown is "intentionally directing his subordinates to violate Plaintiff's Establishment Law Clause Rights by coercing Plaintiff to alter his religious preference. Mr. Brown will not allow Plaintiff to receive Halal-Diet at any DOC/Agency Facility without stating 'Islam/Muslim' on form '030112C,' see 030112E." Id. This allegation is located in the "Parties"

section of Plaintiff's motion to amend. (Dkt. # 54 at 3). Plaintiff does not address the claims against Brown in more detail in any other section of his motion to amend.

The basis for the new claim against Brown appears to stem from information submitted in Plaintiff's original complaint and the Special Report completed by Defendants. In Plaintiff's original complaint, filed July 2, 2013, Plaintiff submitted the correspondence he received from Defendant Johnson denying Plaintiff's halal diet request. See Dkt. # 1, Ex. C at 2. In that memorandum, Defendant Johnson states that Brown directed him to inform Plaintiff of the process to add Sikh, and what steps he would be required to take. See id. Further, the Special Report submitted by Defendants on January 21, 2014, includes an affidavit from Defendant Johnson confirming that, after a discussion with Brown about Plaintiff's request, Defendant Johnson "was advised to tell Plaintiff he would need to enter 'Sikh/Islam' as his religion in order to qualify for the Halal diet." (Dkt. # 22 at 32). Plaintiff waited nearly a year after filing his original complaint, and nearly five months after the filing of the Special Report, to attempt to add claims against Brown. Plaintiff has offered no reason for this delay.

After review of the record and Plaintiff's motion, the Court finds allowing Plaintiff to amend his complaint to include claims against Brown would result in undue delay and prejudice to the original defendants. Evaluation of this new claim would require additional evidence to be submitted and time for Brown to answer or respond to Plaintiff's claims. Additionally, Plaintiff has offered no reason for the delay between the filing of his complaint and the motion to amend. The Tenth Circuit has held undue delay in bringing an amended claim may be "appropriate justification for denying a motion to amend." Cohen v. Longshore, 621 F.3d 1311, 1313 (10th Cir. 2010). The Tenth Circuit focuses primarily on the reasons for the delay, and has held "that denial of leave to

amend is appropriate 'when the party filing the motion has no adequate explanation for the delay.'"

Minter, 451 F.3d at 1206 (quoting Frank v. U.S. West, Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993)).

Further, "courts have denied leave to amend where the moving party was aware of the facts on

which the amendment was based for some time prior to the filing of the motion to amend." Fed. Ins.

Co. v. Gates Learjet Corp., 823 F.2d 383, 387 (10th Cir. 1987). Plaintiff was aware of the facts

which form the basis of his allegations against Brown for at least several months before filing his

motion to amend.[4]

The Court also notes that the resolution of the original complaint will resolve Plaintiff's

claim against Brown. Thus, allowing Plaintiff to amend the complaint to add Brown as a new

defendant is futile and not in the interest of judicial efficiency. Therefore, Plaintiff's motion to

amend to include a claim against Brown is denied without prejudice.

### e.      Eighth Amendment Violations

Plaintiff asserts "his [original] complaint has referred to starvation and inadequate nutrition,[5]

[constituting] violations of [the] Eighth Amendment . . . ." (Dkt. # 54 at 22). Plaintiff also notes

his "8th Amendment Claim is previously cited in Plaintiff['s] grievances," however, he does not

---

[4]The facts which form the basis of Plaintiff's allegations against Brown are included in the original complaint (Dkt. # 1) and the Special Report (Dkt. # 22). The original complaint was filed on July 2, 2013, and the Special Report was filed on January 21, 2014. Therefore, Plaintiff was aware of the facts included in these documents for several months before asserting this new claim against Brown in his motion to amend.

[5]After careful review, the Court finds only one statement in Plaintiff's original complaint that could relate to allegations of starvation or inadequate nutrition. Plaintiff states "DOC policy increases Plaintiff's vulnerability to violate a tenant of his faith and eat Non-Halal foods (meat) or follow his faith and starve by not eating foods that are inconsistent with the diet requested." (Dkt. # 1 at 5). Additionally, this statement, when viewed in context, is used by Plaintiff to support his First Amendment claim. Therefore, the Court finds this vague, conclusory statement is insufficient to state an Eighth Amendment claim.

state which pleadings or "grievances" include his Eighth Amendment claim.  Id. at 26.  After review, the Court can only find short, conclusory statements, very similar to the statement in Plaintiff's complaint, relating to his claim of starvation and inadequate nutrition.  See, e.g., Dkt. # 4, 45.  Further, in each of these short statements, Plaintiff fails to assert his alleged Eighth Amendment violations as a separate claim.  The first instance where Plaintiff describes his claim in more detail is in his motion to amend.  In that motion, he alleges these Eighth Amendment violations took place at JCCC, stating, "JCCC does not provide alternate meals when intentionally serving non-Halal meals, thus providing inadequate nutrition and violating [the] 8th Amendment."  (Dkt. # 54 at 13).

After review of the record, the Court finds allowing Plaintiff to amend will cause undue delay and prejudice to the original defendants.  Evaluation of the Eighth Amendment claim would require additional evidence to be submitted, including a Special Report relating to the allegations raised at JCCC, and time for the new unnamed defendant or defendants to respond to Plaintiff's claims.  Additionally, while Plaintiff has failed to state the facts necessary to form the basis of his Eighth Amendment claim, Plaintiff asserts they were included in his original complaint.  Therefore, Plaintiff states he had knowledge of these facts at the time of his complaint.  As Plaintiff has offered no reason for the delay between the filing of his complaint and the motion to amend, this delay of over a year is another basis for denying Plaintiff's motion to amend.  See Minter, 451 F.3d at 1206.  Therefore, for the foregoing reasons, Plaintiff's motion to amend to include an Eighth Amendment claim is denied without prejudice.

In summary, the Court finds that allowing Plaintiff to amend will cause undue delay and prejudice to the original defendants.  Additionally, it is futile to permit Plaintiff to amend his

complaint in light of the posture of the claims presented in the original complaint. Plaintiff's motion to amend is denied without prejudice.[6]

## 2. Additional Miscellaneous Motions

Also before the Court as preliminary matters are Plaintiff's "motion to supplement evidence bolstering Plaintiff's exhaustion claim at JCCC" (Dkt. # 61), "motion to admit tangible evidence" (Dkt. # 73), and "motion to exhibit newly discovered evidence into the court record" (Dkt. # 75). Defendants filed a motion to strike Plaintiff's motion to supplement. (Dkt. # 65).

Upon review of Plaintiff's motion to supplement (Dkt. # 61), the Court finds that the motion shall be granted. The Court has considered the documents attached to the motion in resolving the issues raised in the complaint. Therefore, Defendants' motion to strike (Dkt. # 65) is moot.

After review of Plaintiff's motion to admit tangible evidence (Dkt. #73) and motion to exhibit newly discovered evidence (Dkt. # 75), the Court interprets both motions as motions to supplement the record. The Court finds the motions shall be granted. The Court has considered the documents attached to the motions in resolving the issues raised in the complaint.

## *ANALYSIS*

In their motion for summary judgment (Dkt. # 55), Defendants argue neither they nor DOC policy violated Plaintiff's first amendment rights, and even if Plaintiff could successfully argue a violation, DOC has a "legitimate government interest in orderly and efficient management of its religious accommodation program and preventing fraudulent applications for a Halal Diet." Id. at

---

[6]Throughout various documents, see, e.g., Dkt. ## 54, 57, 58, 71, 73, Plaintiff mentions additional Due Process and Equal Protection claims. As Plaintiff did not include these claims in his motion to amend, or address them with the specificity required to state a claim, the Court will not address them. If Plaintiff wishes to pursue these separate claims, which are not raised in his original complaint, he will be required to file a new lawsuit.

1; see also id. at 17-18. Defendants also argue the Eleventh Amendment bars Plaintiff's claims for monetary damages, and that Plaintiff's claim for injunctive relief against Defendants Bear, Johnson, Martin and Ojekale is moot. Id. at 21-24. Further, Defendants assert that Plaintiff has failed to exhaust his administrative remedies or allege personal participation of the Defendants,[7] and that Defendants are entitled to qualified immunity. Id. at 21-22, 24-25. After reviewing the record, the Court finds that there is no genuine dispute as to any material fact, and that Defendants are entitled to judgment as a matter of law.

## 1. Legal standards

### a. Summary judgment

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

---

[7]This Court previously determined Plaintiff has alleged personal participation of the Defendants. See Dkt. # 44 at 16. Additionally, the Court finds Plaintiff has exhausted his administrative remedies. Defendants argue in their motion for summary judgment that Plaintiff has "not filed a grievance appeal or submitted any correspondence with the [Administrative Review Authority] concerning his diet at JCCC," thus concluding that, "Plaintiff has failed to exhaust his administrative remedies concerning his complaint about the religious diet he receives at JCCC." (Dkt. # 55 at 22). However, Plaintiff's complaint relates to the halal diet he received while at DCCC. As the Court has denied Plaintiff's motion to amend to include claims from his incarceration at JCCC, Defendants' argument concerning Plaintiff's failure to exhaust administrative remedies at JCCC is irrelevant. Additionally, the Court notes Plaintiff provided documentation demonstrating that he followed the grievance policy outlined in OP-090124, including a grievance appeal to the Administrative Review Authority concerning the halal diet containing vegetarian kosher meals, thereby exhausting his administrative remedies. See Dkt. # 1, Exs. F-I.

essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

### b. First Amendment

#### 1. Establishment Clause

The First Amendment provides that "Congress shall make no law respecting an establishment

of religion, or prohibiting the free exercise thereof. . . ." U.S. CONST. amend. I. "It is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'" Town of Greece v. Galloway, 134 S. Ct. 1811, 1825 (2014) (quoting Cnty. of Allegheny v. Am. Civil Liberties Union, Greater Pittsburg Chapter, 429 U.S. 573, 659 (1989) (Kennedy, J., concurring)). "The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" Cnty. of Allegheny, 492 U.S. at 593-94 (quoting Lynch v. Donnelly, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)). When evaluating claims that government action violates the Establishment Clause, the federal courts routinely apply the test set forth by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602 (1971). See Robinson v. City of Edmund, 68 F.3d 1226, 1229 (10th Cir. 1995) (acknowledging that the test has been harshly criticized by several Justices and federal courts, but never overruled and courts have "continued to apply it almost exclusively"); see also Van Orden v. Perry, 545 U.S. 677, 685-86 (2005) (recognizing that, when the Lemon test does not fit the facts of the case, a few recent Supreme Court decisions applied different tests to Establishment Clause claims). Under Lemon, government action does not run afoul of the Establishment Clause if (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion, and (3) the action must not foster excessive government entanglement with religion. Lemon, 403 U.S. at 612-13.

The Supreme Court refined the Lemon analysis, stating that "government impermissibly endorses religion if its conduct has either (1) the purpose of or (2) the effect of conveying a message that 'religion or a particular religious belief is favored or preferred.'" Bauchman ex rel. Bauchman

v. W. High Sch., 132 F.3d 542, 551 (10th Cir. 1997). "[T]he purpose component of the endorsement test should evaluate whether the government's 'actual' purpose is to endorse or disapprove of religion . . . [and] [t]he effect component . . . evaluate[s] whether a 'reasonable observer,' aware of the history and context of the community in which the conduct occurs, would view the practice as communicating a message of government endorsement or disapproval." Id. at 551-52 (citing Capital Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 779-81 (1995) (O'Connor, J., concurring)). The Tenth Circuit determined the "appropriate" Establishment Clause analysis includes "both the purpose and effect components of the refined endorsement test, together with the entanglement criterion imposed by Lemon." Id. at 552.

## 2. Free Exercise Clause

The Free Exercise Clause of the First Amendment applies to the States through the Fourteenth Amendment. See Cantwell v. Connecticut, 310 U.S. 296, 303 (1940). Prisoners "'retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion.'" Kay v. Bemis, 500 F.3d 1214, 1218 (10th Cir. 2007) (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987)). However, the Supreme Court permits penal institutions to place reasonable limitations on these rights. The Court has held that "a prison regulation imping[ing] on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests." O'Lone, 482 U.S. at 349.

The Tenth Circuit has set forth a two-step inquiry for evaluating an alleged constitutional violation of the Free Exercise Clause. See Kay, 500 F.3d at 1218-19. The prisoner plaintiff must show that a prison regulation "substantially burdened sincerely-held religions beliefs." Id. at 1218 (internal citation omitted). A "substantial burden" exists under the Free Exercise Clause when a

plaintiff alleges the beliefs at issue are religious in nature and sincerely held.  Id.  Plaintiff must allege more than "isolated act[s] of negligence" in order to establish a substantial burden.  See Gallagher v. Shelton, 587 F.3d 1063, 1070 (10th Cir. 2009).  If the prisoner satisfies this burden, the prison officials may "identify the legitimate penological interests that justified the impinging conduct."  Kay, 500 F.3d at 1218 (internal citation omitted).  Then, the court must determine the reasonableness of the regulation based on the factors set forth in Turner v. Safley, 482 U.S. 78, 89-91 (1987).

### c.    Qualified Immunity

"Government officials who perform discretionary functions are entitled to qualified immunity if their conduct does not violate clearly established rights of which a reasonable government official would have known."  Perez v. Unified Gov't of Wyandotte Cnty., 432 F.3d 1163, 1165 (10th Cir. 2005) (citing Hulen v. Yates, 322 F.3d 1229, 1236 (10th Cir. 2003)); see also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  As a result, it is critical to resolve immunity questions at the earliest possible stage in the litigation.  See Saucier v. Katz, 533 U.S. 194, 199-201 (2001).  In Saucier v. Katz, the Supreme Court set forth a mandatory two-prong test to resolve all qualified immunity claims.  When a defendant raises a qualified immunity defense, the plaintiff bears the burden of establishing (1) that the defendant's action violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established at the time of the conduct at issue.  Perez, 432 F.3d at 1165.  "If no constitutional right would have been violated were the allegations established," then no further inquiry regarding

qualified immunity was required. <u>Saucier</u>, 333 U.S. at 201. The Supreme Court, however, stepped

back from the mandatory nature of using this two-prong analysis, <u>see</u> <u>Pearson v. Callahan</u>, 555 U.S.

223 (2009), and now permits courts to "exercise [their] sound discretion in deciding whether to

bypass the first question and proceed directly to the second." <u>Lynch v. Barrett</u>, 703 F.3d 1153, 1159

(10th Cir. 2013).

### d.    Eleventh Amendment Immunity

The Eleventh Amendment prevents suits against a state unless Congress abrogated the states'

Eleventh Amendment immunity or the state waived such protection by statute. <u>See</u> <u>Mt. Healthy City</u>

<u>School Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 279-80 (1977). Eleventh Amendment immunity

does not extend to counties or municipalities, but does extend to "arms of the state." <u>N. Ins. Co. of</u>

<u>New York v. Chatham Cnty., Ga.</u>, 547 U.S. 189, 193 (2006). Further, claims against a government

officer in his or her official capacity are actually claims against the government entity for which the

officer works. <u>Kentucky v. Graham</u>, 473 U.S. 159, 167 (1985). Therefore, "it is no different from

a suit against the State itself." <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989).

### e.    Injunctive Relief

When an inmate is transferred from one facility to another his request for injunctive relief

against the employees of the original facility is generally moot. <u>See</u> <u>Green v. Branson</u>, 108 F.3d

1296, 1299-1300 (10th Cir. 1997); <u>see also</u> <u>Wirsching v. Colorado</u>, 360 F.3d 1191, 1196 (10th Cir.

2004). This holding stems from the understanding that even if an inmate were to receive injunctive

relief against the original employees, they would be unable to provide the inmate with the relief he

seeks. <u>See</u> <u>Jordan v. Scott</u>, 654 F.3d 1012, 1027-29 (10th Cir. 2011). However, if the prisoner is

challenging "policies that apply in a generally uniform fashion throughout a prison system," and he

has "sued defendants who are actually situated to effectuate any prospective relief that the courts might see fit to grant," such as the director of the prison system or the prison system itself, then his claim for injunctive relief is not moot, even after he has been transferred to another facility within the prison system. Id. at 1028. However, if an inmate has only sued prison employees at the institution where he was previously incarcerated, his challenge to a state-wide prison policy is moot upon his transfer to a separate facility within the prison system. Id. at 1028-29.

### 2.     Application of Legal Standards to Plaintiff's Claims

#### a.     Establishment Clause Claim

Plaintiff argues Defendants violated his First Amendment rights under the Establishment Clause by "coerc[ing] [him] to alter his choice of religion to participate in his requested diet." (Dkt. # 1 at 5). This assertion is based both on the verbal statement Defendant Johnson made to Plaintiff, stating that "[Plaintiff] would need to enter 'Sikh/Islam' as his religion in order to qualify for the Halal diet," (Dkt. # 22 at 32), and on DOC policy which does not include Petitioner's stated religion of Sikh in the list of religions eligible to receive a halal diet. See Dkt. # 22-2 at 21. Defendants have submitted DOC Policy, OP-030112, along with "Attachment E" (providing that only "Muslim" and "Nation of Islam" offenders are authorized to receive a halal diet). See id. at 3-27.

Defendants argue DOC policy, and specifically the process outlined by Defendant Johnson in his written response[8] denying Plaintiff's original request for a halal diet, allows for any inmate to request his or her religion be added to the list of approved religions detailed in OP-030112, Attachment E. (Dkt. # 55 at 17). Plaintiff admits he has failed to follow this process to add Sikh

---

[8]The process to request an exception to OP-030112, Attachment E, as outlined by Defendant Johnson, is now detailed in OP-030112(VI)(A)(3), effective August 21, 2014. See Dkt. # 75 at 5.

to the list of approved religions, and contends in response that "Mr. Brown cannot coerce Plaintiff to have his religion added to DOC policy." (Dkt. # 57 at 29). An affidavit of Leo Brown, DOC Agency Chaplain, confirms Plaintiff has not submitted a request to have Sikh added to OP-030112, Attachment E. (Dkt. # 55-4 at 2).

After review of the record, the Court finds DOC policy OP-030112, including the listing of religions approved to receive a religious diet in Attachment E, does not violate the Establishment Clause. Plaintiff has submitted no evidence that the "actual purpose" of the policy is to endorse or disapprove of religion. Defendants assert the purpose of OP-030112, and specifically the creation of Attachment E listing approved religions, is to combat the realities of the prison system. See Dkt. # 55 at 8-10. It appears the policy attempts to maintain consistency among DOC facilities, and facilitate easy approval of religious diets when an inmate is transferred from one facility to another. The purpose of the policy does not appear to convey a message that a "religion or a particular religious belief is favored or preferred." Bauchman ex rel. Bauchman, 132 F.3d at 551. Further, a reasonable observer, aware of the context that DCCC is a DOC facility housing offenders, would not view DOC policy, including the avenue available for accommodation, as communicating a message of government endorsement or disapproval.

Plaintiff also alleges the statement made by Defendant Johnson, that "[Plaintiff] would need to enter 'Sikh/Islam' as his religion in order to qualify for the Halal diet," coerced him into changing his religious preference. (Dkt. # 22 at 32). However, Defendant Johnson also provided Plaintiff with a written response to his request for a halal diet which outlined the process to add Sikh to OP-030112, Attachment E. (Dkt. # 22-3 at 4). The written response, along with DOC policy,

demonstrates that DOC offered a reasonable means to address Plaintiff's request for a halal diet as a practitioner of the Sikh religion.[9]

Instead of following the process outlined by Defendant Johnson, Plaintiff resubmitted his request for a halal diet changing his religion to "Sikh (Islam/Hindu)." (Dkt. # 22-4 at 2). Plaintiff asserts he was not required to follow the procedure outlined by Defendant Johnson because he had previously been approved for a halal diet at William S. Key Correctional Center (WSKCC). (Dkt. # 57 at 2). In support, Plaintiff relies upon the affidavit of WSKCC Chaplain Ron Roskam. (Dkt. # 22 at 34). In the affidavit, Chaplain Roskam states that he "did receive documentation from [Plaintiff] containing 'sacred text' information as to his need for a Halal religious diet because his faith includes a mixture with the Islam religion which requires the diet and the Plaintiff was approved for the Halal diet while being assigned to the [WSKCC]." Id. Plaintiff alleges he is not required to follow this procedure again at DCCC because DOC policy OP-030112(VI)(A)(6)[10]

_____

[9]Plaintiff has argued he is unable to follow the process outlined by Defendant Johnson to add Sikh to OP-030112, Attachment E, because "Qur'an(s) are banned from all DOC institutions State-wide." (Dkt. # 63 at 2). Plaintiff alleges Agency Chaplain Leo Brown initiated this ban. Therefore, Plaintiff argues he is "prohibited by Mr. Brown's authority to demonstrate how his religion mandates compliance to Halal-Diet . . . because Plaintiff's (religious) sacred text is [the] Noble Qur'an." Id. However, Plaintiff fails to point to any DOC policy restricting his access to the Qur'an, or provide any evidence regarding this issue. The only documentation Plaintiff provides are two requests to staff he submitted (Id. at 7; Dkt. # 72 at 7), and a letter from a third party to Chaplain Drawbridge questioning the Chaplain about prisoners' access to the Qur'an. See Dkt. # 63 at 8. The Court notes Plaintiff has submitted photocopied pages of the Qur'an that demonstrate the requirement of a halal diet. See Dkt. # 37 at 121-130. These photocopies were submitted while Plaintiff was incarcerated at DCCC, and they reflect the information Plaintiff would be required to submit to DOC to request Sikh be added to OP-030112, Attachment E. Therefore, Plaintiff has failed to submit evidence that is he unable to comply with the process outlined by Defendant Johnson to add his requested religion to DOC policy.

[10]OP-030112(VI)(A)(6) provides, "[f]acility chaplains will maintain on file all offenders that request a Kosher or Halal Diet that will include all request forms, incident reports and any other relevant documentation."

requires each facility to maintain on file offender requests and/or documentation for a religious diet. (Dkt. # 57 at 3).  Plaintiff asserts Defendants at DCCC violated this policy by refusing to verify his previous approval for a halal diet at WSKCC.  Id.

However, Plaintiff acknowledges OP-030112(VI)(A)(3) also states, "[o]ffenders must reapply for their religious diet upon transfer to another facility."  Id.  After Plaintiff's transfer to DCCC, Plaintiff reapplied, as required, for his religious diet.  (Dkt. # 22-3 at 2).  Defendant Johnson denied Plaintiff's initial request, but included instructions detailing how Plaintiff could add his requested religion to the approved list.  Id. at 2-4.  Defendant Johnson's directions included requesting that Plaintiff present sacred text confirming his need for a halal diet, just as the Chaplain at WSKCC required.  Id. at 4.  Rather than follow Defendant Johnson's instructions, Plaintiff chose to resubmit his request for a halal diet changing his religious preference to "Sikh (Islam/Hindu)." (Dkt. # 22-4 at 2).

Through the process outlined in Defendant Johnson's written response, Plaintiff could request that "Sikh" be added to the list of religions eligible to receive a halal diet listed in OP-030112, Attachment E.  However, Plaintiff has chosen not to pursue this accommodation process. While Plaintiff is correct that Defendants "may not coerce Plaintiff to have his religion added to DOC Policy," Plaintiff's refusal to follow the accommodation procedure does not render the policy unconstitutional.  Therefore, the Court concludes that neither DOC policy, nor the statement made by Defendant Johnson, violated Plaintiff's rights under the Establishment Clause.

**b.        Free Exercise Clause Claim**

Plaintiff alleges the halal diet provided by DOC contains non-halal meals, namely kosher certified meals, and violates his religious practice.  (Dkt. # 1 at 7-8).  Plaintiff asserts the "Kosher-

certified" and "Kosher-vegetarian" meals he receives violate the tenants of a halal diet.  (Dkt. # 57 at 9).  Defendants argue Plaintiff's religious exercise has not been substantially burdened because he does in fact receive a halal diet which has been approved by religious leaders.  (Dkt. # 55 at 13). Additionally, Defendants argue that even if DOC policy burdens Plaintiff's religious exercise, the policy satisfies the factors set out in Turner v. Safley, 482 U.S. 78 (1987).  (Dkt. # 55 at 16).

The first step in analyzing a free exercise claim by a prisoner is to determine if the prison regulation substantially burdens sincerely-held religious beliefs.  See Kay, 500 F.3d at 1218-1219. The Tenth Circuit follows the rule that "religious dietary practices [are] constitutionally protected . . . even if such dietary practices are not doctrinally 'required' by the prisoner's religion.  'Sincerely held' is different from 'central,' and courts have rightly shied away from attempting to gauge how central a sincerely held belief is to the believer's religion."  Id. at 1220 (quoting Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007)).

Here, Plaintiff identifies his religion as Sikh and asserts that his religious practice requires him to adhere to a halal diet.  Defendants do not appear to dispute the sincerity of Plaintiff's religious belief, and nothing in the record suggests Plaintiff's religious beliefs lack sincerity.[11] Therefore, the question becomes whether Plaintiff's sincerely held beliefs are substantially burdened by DOC policy.  The Tenth Circuit has confirmed prisoners must allege more than "isolated act[s] of negligence" to establish a substantial burden.  See Gallagher, 587 F.3d at 1070.

---

[11]As the Tenth Circuit in Kay noted, "The inquiry into the sincerity of a free-exercise plaintiff's religious beliefs is almost exclusively a credibility assessment, . . . and therefore the issue of sincerity can rarely be determined on summary judgment."  Kay, 500 F.3d at 1219 (quoting Snyder v. Murray City Corp., 124 F.3d 1349, 1352-53 (10th Cir. 1997)).

Plaintiff alleges the DOC master menu substantially burdens his religious beliefs by forcing him to "support/practise [sic] Jewish dietary requirements through LaBruite Kosher-Certified Vegetarian Meals while violating a central tenet of my faith."  (Dkt. # 57 at 34).  Plaintiff further argues that "DOC and Defendants [have] fail[ed] to show this Court how the provision of Kosher meals do[es] not substantially burden Plaintiff's exercise of his sincerely held religious beliefs . . . ." (Dkt. # 57 at 39).  Defendants argue in response that Plaintiff did in fact receive a halal diet at DCCC.  (Dkt. # 55 at 13).  Defendants included in their motion for summary judgment certification documents for the two vendors who supply the meals Plaintiff received while at DCCC.  See Dkt. ## 55-8, 55-9, 55-10, 55-11.  Additionally Defendants submitted evidence that the master menu has been approved by religious authorities confirming the standards are halal, and by a registered dietician approving the nutritional content of the meals.  See Dkt. ## 55-4, 55-7.

Plaintiff's main complaint appears to stem from his receipt of pre-packaged meals bearing kosher certification marks and not halal certification marks.  Outside of isolated incidents, discussed in greater detail below, these kosher certified meals have been vegetarian meals.  See Dkt. # 37 at 158-181; Dkt. # 57 at 67-76.  The other meals Plaintiff receives from the DOC master menu are halal certified meals, some of which contain meat.  See Dkt. # 55-5 at 1; Dkt # 57 at 77-79; Dkt. # 73, Attachment 1.  The remainder of Plaintiff's complaints relate to isolated incidents of missing food items and inadequate food preparation.  See Dkt. ## 22-20, 22-22, 22-23, 22-26, 22-29, 22-33.

After review of the record, this Court finds the isolated incidents of food service issues referenced above do not constitute a substantial burden.  These complaints relate to portion sizes, missing food items including fruit and condiments, and general complaints regarding food preparation.  As the Tenth Circuit explained, "isolated act[s] of negligence [will] not violate an

inmate's First Amendment right to free exercise of religion." <u>Gallagher</u>, 587 F.3d at 1070.  Plaintiff

fails to show how these isolated incidents substantially burden his sincerely held religious beliefs.

In contrast, as this Court noted previously in the Opinion and Order denying Defendants'

motion to dismiss (Dkt. # 44), Plaintiff's claims regarding the vegetarian kosher meals included in

the halal master menu concern more than isolated acts of negligence.  The halal master menu is

approved by DOC officials, and implemented by DOC policy via OP-030112.  Therefore, the

inclusion of vegetarian kosher meals into the halal diet plan requires further analysis.

First, the Court notes that, at the time of his complaint, Plaintiff claimed the DOC halal menu

contained only three to four halal meals per week.  Recently, however, Plaintiff has filed with the

Court his "motion to admit tangible evidence" in which he submits a new halal menu.  (Dkt. # 73,

Attachment 1).  Of the fourteen pre-packaged meals served each week on this new halal menu, nine

are now halal certified.  <u>Id.</u>  The remaining five pre-packaged meals per week are vegetarian kosher

meals.  <u>Id.</u>

In his response to Defendants' motion for summary judgment, Plaintiff alleges the vegetarian

kosher certified meals substantially burden his exercise of religion because the vegetarian kosher

meals are blessed "not in the name of ALLAH."  (Dkt. # 57 at 9).  However, the record contains

Plaintiff's various statements demonstrating that those adhering to a halal diet may consume

vegetarian meals.  In an "Offender Grievance Report Form" dated May 17, 2013 Plaintiff notes,

"Halal [offenders] can eat all general population food except meats."  <u>See</u> Dkt. # 1, Ex. G at 2.

Further, Plaintiff has submitted excerpts from literature,[12] stating that, "[i]f an authentic and genuine

---

[12]SYED RASHEEDUDDIN AHMED, A COMPREHENSIVE LIST OF HALAL FOOD PRODUCTS IN US
SUPERMARKETS xv-xvii (8th ed. 2009).

non meat kosher certified food products bearing kosher symbols . . . meet the Islamic dietary requirements, then those products are considered Halal." (Dkt. # 37 at 145). Additionally, "[t]here are many food products available that maintain certification for both Halal and Kosher; however, under the Halal restriction, only those food products that are non-meat qualify." (Dkt. # 57 at 11). Through these statements, and Plaintiff's own continued efforts to prove certain commissary items are halal even if they do not carry certification marks,[13] Plaintiff acknowledges not all halal food is "halal certified."

The Court finds that Plaintiff has failed to address or controvert Defendants' evidence that DOC's halal procedure and menu adheres to the requirements of a halal diet. See Dkt. # 55-4. The affidavit of Agency Chaplain Leo Brown states,

> DOC's policy . . . regarding the preparation of the Halal diet meals was approved by an Imam[14] from the Islamic Society of Greater Oklahoma City, representatives of the Council on American Islamic Relations and Islamic members of the Oklahoma Department of Corrections Advisory Council on Offender Religious Rights and Practices to ensure that the policy and protocol ensure the meals served meet Halal standards. These religious figures also confirmed to DOC officials formulating the religious meals policy that a vegetarian kosher meal satisfies halal standards because kosher food is prepared under more strict guidelines than halal.

Id. at 3. Plaintiff refers to these religious figures as "No-Name Imams," but fails to provide any evidence that DOC policy, including the serving of vegetarian kosher meals, was in fact not approved by religious leaders, or that these religious organizations are not qualified to offer

---

[13]Plaintiff has submitted to the Court correspondence with various food companies confirming items available for purchase in the commissary that do not bear halal certification symbols are in fact halal foods. "The following brands do not bear any symbols, but Plaintiff has evinced necessary documentation that would allow him or any other religious diet offender in DOC to purchase such food products . . . ." See Dkt. # 57 at 11.

[14]An Imam is a "religious leader or authority in the Islamic faith." (Dkt. #55-4 at 3).

guidance concerning the DOC policy. See Dkt. # 57 at 12. As Plaintiff's own statements and provided literature explain, non-meat meals which are kosher certified may qualify as halal foods. DOC has provided evidence demonstrating that religious authorities and organizations confirmed the inclusion of vegetarian kosher meals is acceptable.[15]

Plaintiff offers two arguments explaining why DOC must serve pre-packaged halal certified food items at each meal. First, Plaintiff argues DOC is required to provide pre-packaged halal certified meals where the menu calls for pre-packaged kosher meals, based upon the settlement agreement reached between DOC and a different inmate in Abdulhaseeb v. Calbone, W.D. Okla. Case No. 05-Civ-1211. (Dkt. # 57 at 36). However, as explained in more detail in the "Final Miscellaneous Motions" section below, Plaintiff lacks standing to enforce this settlement agreement.

Next, Plaintiff argues the language included in the purchase order between DOC and the halal food vendors requires each meal to carry a  halal certification mark. (Dkt. # 57 at 4). The language includes DOC's purpose of purchasing the meals, price expectations, meal specifications, and other proposed contract terms. (Dkt. # 55-8 at 5-8). Plaintiff points directly to the portion of the contract language which states, "[e]ach meal/entree shall be certified by a nationally accepted religious certification agency, [e]ach meal/entree shall be marked with the certification symbol from the religious certification agency." (Dkt. # 57 at 4) (quoting Dkt. # 55-8 at 6). This language appears to relate to  a possible contract between DOC and a food vendor. These proposed contract guidelines are not DOC policy, nor are they included in OP-030112, governing religious food policy

---

[15]The Court also notes that the kosher certification company, identified on the food labels Plaintiff has sent the Court, confirms that "kosher" does not mean the foods have been blessed by a Rabbi. Instead, the company explains, the certification mark indicates the food was prepared according to Jewish dietary laws. What is "Kosher", KOF-K KOSHER SUPERVISION, www.kof-k.org/kosher (last visited October 17, 2014).

at DOC facilities.  Therefore, Plaintiff's use of this contract language to bolster his argument that DOC is required to provide pre-packaged halal certified food at each meal is unpersuasive.

After careful review of the record, the Court finds DOC's policy, specifically the halal master menu, does not substantially burden Plaintiff's sincerely held religious beliefs.  Defendants have submitted evidence confirming the approval of the vegetarian kosher meals, and Plaintiff has failed to controvert this evidence.

Plaintiff also fails to demonstrate that being served kosher meals containing meat[16] substantially burdened his sincerely held religious beliefs.  Plaintiff has submitted excerpts from SYED RASHEEDUDDIN AHMED, A COMPREHENSIVE LIST OF HALAL FOOD PRODUCTS IN US SUPERMARKETS xv-xvii (8th ed. 2009), stating that the slaughter of animals, including the procedure and types of acceptable meat, varies between halal and kosher, and that because of these differences kosher meat is not halal.  (Dkt. # 37 at 146).  While the Court agrees the inclusion of kosher certified meals containing meats in the halal master menu would require further analysis, in this case, Plaintiff fails to demonstrate that being served meals containing kosher meats was anything more than

_____

[16]Plaintiff has submitted dozens of food labels to the Court.  In particular, Plaintiff sent to the Court various labels from pre-packaged meals he alleges he received from April 25, 2013, to February 6, 2014 while on a halal diet at DCCC.  See Dkt. # 37 at 12.  Of these food labels spanning approximately nine and a half months, 40 are from pre-packaged meals containing kosher meat, or approximately 4.6 percent of the meals Plaintiff received while at DCCC.  See id. at 158-181.  The last food label from a meal containing kosher meat was allegedly served to Plaintiff at DCCC on December 31, 2013.  See id. at 177.  Since his transfer from DCCC in February of 2014, Plaintiff has submitted additional food labels, only one of which is from a meal containing kosher meat.  See Dkt. # 46 at 6 (while Plaintiff has submitted this individual label multiple times as part of different documents, it is the same label from the kosher meal containing meat he was allegedly served on May 1, 2014).  Therefore, all but one of these additional food labels are from kosher vegetarian meals that are included in the halal master menu.  The Court also notes that Plaintiff's arguments, including his response to Defendants' motion for summary judgment, focus on the inclusion of vegetarian kosher meals.  See, e.g., Dkt. ## 46, 54, 57, 73.

isolated incidents of negligence. Significantly, the halal master menu submitted by both Plaintiff and Defendants does not include kosher meals containing meat. See Dkt. # 55-5 at 1. The meals Plaintiff allegedly received containing kosher meat are categorized by DOC as meals only kosher diet offenders should receive. See Dkt. # 37 at 66. Plaintiff has submitted no evidence to suggest the DOC personnel who served Plaintiff the pre-packaged meals containing kosher meat were acting intentionally. See Gallagher, 587 F.3d 1063, 1070 (quoting Lovelace v. Lee, 472 F.3d 174, 201 (4th Cir. 2006) ("[Plaintiff] must assert conscious or intentional interference with his free exercise rights to state a valid claim under § 1983")). Therefore, it appears the pre-packaged kosher meals Plaintiff received containing kosher meat were isolated acts of negligence. The Court finds these isolated acts of negligence do not constitute a substantial burden on Plaintiff's free exercise rights.

Even if the Court were to determine the DOC halal menu substantially burdened Plaintiff's rights, the policy and menu are reasonably related to valid penological interests. Prison regulations affecting free speech or free exercise are 'valid if [they are] reasonably related to legitimate penological interests.'" Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (quoting Turner, 482 U.S. at 89); see also Hammons v. Saffle, 348 F.3d 1250, 1254 (10th Cir. 2003) ("[i]nmates' free exercise rights are . . . subject to prison restrictions rationally related to legitimate penological interests"). The Tenth Circuit balances the factors outlined in Turner, 482 U.S. 78, to determine the reasonableness of a prison regulation. See Kay, 500 F.3d at 1219. Under Turner, a court is to determine first if a 'valid, rational connection' [exists] between the prison regulation and the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89 (quoting Block v. Rutherford, 468 U.S. 576, 586 (1984)). Second, courts consider "whether there are alternative means of exercising the right that remain open to prison inmates." Id. at 90. Third, courts are to

determine "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id. Fourth, courts consider "whether any policy alternatives exist that would accommodate the right in question at a de minimis cost to the prison." Hammons, 348 F.3d at 1255. Of the four Turner factors, "the first is the most important . . . [because] it is 'not simply a consideration to be weighed but rather an essential requirement.'" Al-Owhali v. Holder, 687 F.3d 1236, 1240 (10th Cir. 2012) (quoting Boles v. Neet, 486 F.3d 1177, 1181 (10th Cir. 2007)).

As the Tenth Circuit has noted, to satisfy the first prong of the Turner analysis, "the prison administration is required to make a minimal showing that a rational relationship exists between its policy and stated goals." Beerheide v. Suthers, 286 F.3d 1179, 1186 (10th Cir. 2002). The Defendants have made this minimal showing. The halal master menu is reasonably related to the legitimate penological interest of maintaining orderly, efficient, and consistent management and application of its religious diet options. See Dkt. ## 55 at 17, 55-4.[17] Additionally, the menu and DOC policy were reasonably applied. Defendants have demonstrated that the master menu is followed at each DOC facility, and "[i]f the exact meal on the Halal menu is not available, [DOC facilities] provide a nutritionally equivalent substitute that provides a similar caloric value." (Dkt. # 55-4 at 2-3). Further, DOC policy details the required procedure facilities should follow regarding religious food preparation and service. (Dkt. # 22-2 at 23-27). This procedure includes distinctions between kosher and halal food preparation. Id. at 27. Plaintiff has failed to "point to evidence

---

[17]While the Court notes the majority of the information submitted in the affidavit of DOC Chaplain Leo Brown (Dkt. # 55-4) relates to the penological interests that support DOC maintaining a list of approved religions that may receive a specific religious diet – relating more to Plaintiff's Establishment Clause claim – the affidavit, and DOC policy itself, also includes the penological interests related to DOC's adherence to the halal master menu.

creating genuine factual disputes that undermine those views . . . [and] [a]bsent such evidence, defendants' affidavit is sufficient to establish, on summary judgment, 'that the regulations do, in fact, serve the function[s] identified' by the prison defendants." Wardell v. Duncan, 470 F.3d 954, 960 (10th Cir. 2006) (quoting Beard v. Banks, 548 U.S. 521, 531 (2006)).

Regarding the second Turner factor, Defendants argue that DOC policy, specifically OP-030112 (II, IV), "provide[s] Plaintiff with a litany of reasonable alternatives to observe his religious practice." (Dkt. # 55 at 19). Specifically Defendants note that Plaintiff "may request access to a religious leader to provide worship, counseling, and religious instruction." Id. at 18. Defendants argue these alternatives "allow[ ] Plaintiff to engage in religious activities in order to observe his religion." Id. However, none of the religious activities cited to by Defendants relate to Plaintiff's religious diet. As the Supreme Court explained, the proposed alternative means should relate to the "asserted right" at issue. Turner, 482 U.S. at 90; see also Beerheide, 286 F.3d at 1187 (the Court only addressed the alternatives offered by DOC which provided the Plaintiff with alternative means to follow the dietary laws mandated by Plaintiff's religion). Therefore, these general alternatives offered by Defendants do not relate to the analysis of the second Turner factor in this case.

However, Defendants also assert that DOC policy provides for alternative means relating to food options, such as meat-free and pork-free diets. (Dkt. # 55 at 18). These diet alternatives are offered in addition to the kosher and halal diet options, and are available to offenders from any religious faith. Id. For these alternatives to satisfy the second Turner factor they "need not be ideal . . . they need only be available." Wardell v. Duncan, 470 F.3d 954, 961 (10th Cir. 2006) (quoting Wirsching v. Colorado, 360 F.3d 1191, 1200 (10th Cir. 2004)). Therefore, "even if not the 'best method' from the inmate's point of view, if another means of exercising the right exists, the second

<u>Turner</u> factor does not undercut the challenged restriction." <u>Id.</u> at 961-62. Plaintiff has failed to demonstrate that these religious diet alternatives are unacceptable and leave no alternative way for Plaintiff to exercise his religious beliefs. Thus the second <u>Turner</u> factor weighs in favor of Defendants.

Addressing the third <u>Turner</u> factor, Defendants noted in their motion for summary judgment, that "[s]ince Defendants maintain that Plaintiff receives a Halal Diet as he has requested, such an accommodation would not have an effect on prison resources." (Dkt. # 55 at 19). Defendants make no argument explaining what the impact on prison resources would be if the halal master menu did not contain the vegetarian kosher meals. In response, Plaintiff reasserts his position that the vegetarian kosher meals included in the halal menu "violate Plaintiff's right to receive certified [ ] Halal pre-packaged meals in accordance with his faith," and points to Defendants' argument quoted above. (Dkt. # 57 at 43). As neither party directly addressed the question of what impact accommodating Plaintiff's asserted right to a halal diet free from vegetarian kosher meals would have on the prison facility, this factor does not weigh in either party's favor.

Finally, in Plaintiff's most recent motion, entitled "Motion to Admit Tangible Evidence(s)," Plaintiff submitted to the Court halal meal options from a separate food vendor: Midmar Corporation. (Dkt. # 73, Attachment 3). However, Plaintiff fails to show that this alternative would fully accommodate Plaintiff's rights at <u>de minimis</u> cost to the valid penological interests asserted by the Defendants, as required by <u>Turner</u>. Therefore, no obvious, easy alternative has been presented that would "be evidence that the regulation is not reasonable . . . ." <u>Turner</u>, 482 U.S. at 90.

Overall, the _Turner_ factors weigh in favor of DOC's policy and the creation of the halal master menu. As _Turner_ and other cases applying its analysis make clear, the determination focuses on the reasonableness of the prison restriction. After weighing the _Turner_ factors, including the penological interests asserted by Defendants, the court finds the regulation is a reasonable restriction. While the master menu may not conform with each offender's preference or specific requests, Defendants have presented evidence that DOC consulted religious leaders and organizations when creating the halal policy and menu in an attempt to accommodate halal diet offenders.

It appears that Plaintiff seeks an individualized halal menu which conforms to his specific requests. Plaintiff makes clear through his pleadings he is requesting a halal diet composed completely of pre-packaged halal certified meals. However, for the reasons explained above, Plaintiff has failed to show the DOC master halal menu substantially burdens his free exercise of religion. Additionally, even if the court were to determine Plaintiff's rights were substantially burdened by the halal master menu, the _Turner_ factors weigh in favor of DOC policy, including the halal master menu. The record shows DOC made efforts during the creation of the master menu and halal food preparation policy to accommodate halal diet offenders, including obtaining the approval of religious authorities. It would be unreasonable to require DOC to construct an individualized halal meal plan to satisfy the preferences of each requesting offender. Based on the reasons detailed herein, the Court concludes DOC policy and the halal master menu do not violate Plaintiff's Free Exercise Rights under the First Amendment.

### c.    Immunity

As to Defendants' claims of immunity, <u>see</u> Dkt. # 55 at 23-25, the Court finds that all Defendants are entitled to qualified immunity from individual liability.[18]  They are entitled to qualified immunity from individual liability unless Plaintiff can show their actions violated a clearly established constitutional right.  <u>See</u> <u>Perez</u>, 432 F.3d at 1165.  Plaintiff bears the burden of establishing the violation of a constitutional right and, as stated above, he has failed to do so.  Therefore, having found no constitutional violation, Defendants are entitled to qualified immunity.

Additionally, Defendants argue they are entitled to Eleventh Amendment immunity.  <u>See</u> Dkt. # 55 at 23-24.  The Tenth Circuit has declared that "DOC is an arm" of the State of Oklahoma and is entitled to absolute immunity under the Eleventh Amendment.  <u>Eastwood v. Dep't of Corr. of State of Okla.</u>, 846 F.2d 627, 631-32 (10th Cir. 1988).  As a result, because all of the Defendants are state officials under Oklahoma law, they are entitled to Eleventh Amendment immunity from claims against them in their official capacities.  <u>See</u> <u>Northern Ins. Co. of New York</u>, 547 U.S. at 193.

### d.    Injunctive Relief

Defendants also argue "[t]o the extent Plaintiff's complaint seeks injunctive relief from [Defendants] Bear, Johnson, Martin and Ojekale, his claim is moot."  (Dkt. # 55 at 22).  The Tenth Circuit has held that when an inmate is transferred from one facility to another, his request for injunctive relief against the employees of the original facility is generally moot.  <u>See</u> <u>Green</u>, 108 F.3d at 1299-1300.  Defendants Bear, Johnson, Martin and Ojekale were all employees of DOC

---

[18]All of the Defendants are government officials and were acting in their official capacity during the events that gave rise to Plaintiff's complaint.

working at DCCC. The claims giving rise to Plaintiff's complaint occurred at DCCC. Since filing his § 1983 complaint, Plaintiff has been transferred to several different DOC facilities and currently resides at JDCC. Plaintiff is challenging a policy that is applied uniformly throughout the prison system, however, because Plaintiff is no longer housed at DCCC, Defendants Bear, Johnson, Martin and Ojekale would be unable to "effectuate any prospective relief that the courts might see fit to grant." See Jordan, 654 F.3d at 1028. Therefore, the Court finds Plaintiff's claim for injunctive relief is moot as to Defendants Bear, Johnson, Martin and Ojekale.

### FINAL MISCELLANEOUS MOTIONS

Also before the Court are Plaintiff's motions to "compel Defendants' counsel to comply with change of address/service" (Dkt. # 59), and "for contempt order against Defendant Patton" (Dkt. # 62). As the Court has now granted Summary Judgment in favor of the Defendants, the Court finds Plaintiff's motion to compel Defendants' counsel to comply with his change of address is moot. Additionally, Plaintiff no longer resides at JCCC, the address change Plaintiff wishes to enforce.

Next, Plaintiff filed a motion for a "contempt order against Defendant Patton." (Dkt. # 62 at 1). The basis of the contempt order sought by Plaintiff relates to a settlement agreement reached in Abdulhaseeb, W.D. Okla. Case No. 05-Civ-1211. In that case, the court entered an order reflecting a settlement agreement reached by the plaintiff and DOC. See Dkt. #62 at 1. The settlement agreement provided that the Plaintiff, Abdulhaseeb, would be served a halal diet while housed in a DOC facility, specifying that "anywhere a Kosher meal is called for, a comparable Halal meal shall replace it." Id. (quoting Abdulhaseeb, W.D. Okla. 05-Civ-1211, Dkt. # 231 at 2). Defendants' filed a response in opposition to Plaintiff's motion for contempt. (Dkt. # 67).

Defendants argue Plaintiff lacks standing to enforce the settlement agreement reached in Abdulhaseeb.  Id. at 1-3.  Plaintiff filed a reply to Defendants' response.  (Dkt. # 70).

Plaintiff admits he was not a party to the settlement agreement in Abdulhaseeb.  Instead, Plaintiff argues he "can enforce [the] settlement agreement under invocation by the Court to which will benefit him and is entitled to seek such enforcement of those terms even though Plaintiff is not a party."  Id. at 1.  While Plaintiff's motion requests a contempt order under Federal Rule of Civil Procedure 60(b), all the cases and argument Plaintiff submits rely on Federal Rule of Civil Procedure 71.  While Rule 60(b) is limited to a "party or its legal representative," Rule 71 allows a nonparty to enforce an order in their favor.  Therefore, it appears Plaintiff requests to enforce the order entered in Abdulhaseeb under Rule 71.  Rule 71 states, "[w]hen an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party."

In support of this argument, Plaintiff cites several cases in which a nonparty used Rule 71 when attempting to enforce an order entered by a court reflecting a settlement agreement.  In each of these cases, the agreement itself provided that a larger group or classification of people would be permitted to enforce the order.  See Floyd v. Ortiz, 300 F.3d 1223, 1225-26 (10th Cir. 2002) (the parties agreed "the Agreement would benefit, and be enforceable by, all DOC inmates, not just the named plaintiffs," therefore, the plaintiff in Floyd was "entitled, as a present inmate for whose benefit the Agreement was entered, to seek enforcement on its terms."); Moore v. Tangipahoa Parish Sch. Bd., 625 F.2d 33, 34-35 (5th Cir. 1980) (while the original parties intended the order would benefit non-parties, the plaintiff's interest she sought to protect did not fall "within the zone of interests to be protected or regulated by the . . . constitutional guarantee in question"); Brennan v.

Nassau Cnty., 352 F.3d 60, 64-65 (2d Cir. 2003) (holding the plaintiffs were members of the nonparty group identified within the decree, which stated, the decree was "final and binding between the parties . . . as well as upon all persons who consent to and accept the relief provided herein"); Berger v. Heckler, 771 F.2d 1556, 1565 (2d Cir. 1985) (holding "the interveners properly sought to enforce obedience to a prior order made in their favor. The consent decree is conceded to provide benefits to non-parties," and its "construction benefits innumerable applicants"); Lasky v. Quinlan, 558 F.2d 1133, 1137 (2d Cir. 1977) (holding the plaintiff did not have standing to sue because the plaintiff was no longer a current inmate at the jail).

However, unlike the parties in the cases cited above, the parties to the Abdulhaseeb agreement clearly stated that the order would not be enforceable by a nonparty:

> This Order as it relates to Halal meals is not meant to benefit any person other than the Plaintiff herein and is not intended the require the Defendant, DOC or the State of Oklahoma to be bound to, or by, the terms of this Order for the benefit of anyone but the Plaintiff, except as set forth in Paragraph 7.[19]

(Dkt. # 67 at 4) (quoting Abdulhaseeb, W.D. Okla. 05-Civ-1211, Dkt. # 231 at 2).

After review of the facts and applicable law, the Court finds the order entered by the District Court for the Western District of Oklahoma in Abdulhaseeb, as it related to daily halal meals served at DOC facilities, did not grant relief for Plaintiff, or benefit Plaintiff, as required for enforcement under Rule 71. The order makes clear it was not intended to benefit any other person, or group of persons. For those reasons, Plaintiff lacks standing to enforce the Order as a nonparty under Rule 71. Plaintiff's motion for contempt against Defendant Patton is denied.

---

[19]Paragraph 7 provided that the defendants agreed to locate "an approved vendor to provide holiday food, through the canteen, which the Muslim inmates may purchase." (Dkt. # 67 at 4) (citing Abdulhaseeb, W.D. Okla. 05-cv-1211, Dkt. # 231 at 3).

*CONCLUSION*

Plaintiff fails to demonstrate that the halal diet provided to Plaintiff by DOC violated his constitutional right under the First Amendment to the United States Constitution. There is no dispute as to any material fact. Defendants are entitled to summary judgment in their favor.

**ACCORDINGLY, IT IS HEREBY ORDERED that:**

1.  Defendants' motion to for summary judgment (Dkt. # 55) is **granted**.

2.  Plaintiff's motion to amend the complaint (Dkt. # 54) is **denied**.

3.  Plaintiff's motion for leave to file reply (Dkt. # 58) is **granted**.

4.  Plaintiff's motion to compel (Dkt. # 59) is **moot**.

5.  Plaintiff's motion to supplement evidence (Dkt. # 61) is **granted**.

6.  Plaintiff's motion for contempt order (Dkt. # 62) is **denied**.

7.  Defendants' motion to strike (Dkt. # 65) is **moot**.

8.  Plaintiff's motion to admit tangible evidence (Dkt. # 73) is **granted**.

9.  Plaintiff's motion to exhibit newly discovered evidence (Dkt. # 75) is **granted**.

10. This is a final order terminating this action.

11. A separate judgment shall be entered in this case.

**DATED** this 13th day of November, 2014.

James H. Payne
United States District Judge
Northern District of Oklahoma